of October, and reported him in bed, ill with a sore throat and catarrhal bronchitis and some catarrh of the stomach; and the surgeon says that he was then unfit for duty on account of these ailments, and that he prescribed for him, and kept him on the sick list until the morning of November 7, 1895, when he returned to duty. The surgeon also said that he thought that his sore throat and bronchitis were fairly attributable to a heavy cold owing to extra registry duty; that the stomach trouble was to some extent caused by the relator's drinking, and that he did not think that the relator was an habitual drinker, although visiting him every day from the time of the first visit to the date of the trial. The relator was sworn, and said that after he performed his dog watch from 6 to 8 on the 29th, he answered return roll call, and then went to his sister-in-law's house, getting there about 9 o'clock, when he went to bed, too ill to move until the next afternoon, when his wife came, and he was taken home, and had been under charge of the police surgeon ever since; that he had been on the force for 12 years, during which term he never had a charge for intoxication against him. This testimony of the relator is confirmed by the relator's niece, who was living with her mother at the house where the relator was taken sick. Every witness who testified as to the relator confirmed his account of his sickness, and there is not a particle of evidence to justify the suspicion that the relator's story was not strictly true. That he was sick, and unfit for duty, on the 30th, is clearly established by the physician of the department. That that sickness commenced on the 29th, as the relator and his witness swear it did, is most probable, and from the evidence it may be said to have been most satisfactorily established, and without the proof of a single fact that would justify any opposing inference. It is impossible for us to conceive how any man, from reading this testimony, could come to any other conclusion than that the relator's absence from duty was caused by a serious sickness, which incapacitated him. That fact being established, it is clear that there was no neglect of duty, and that the charge was unproved; in fact, disproved.

The proceeding must, therefore, be reversed, and the relator reinstated, with costs. All concur.

(7 App. Div. 145)

AETNA INS. CO. v. MAYOR, ETC., OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. June 29, 1896.)

1. TAXATION—INSURANCE COMPANIES—RETROACTIVE EFFECT OF STATUTE.
    Laws 1886, c. 679 (approved June 15, 1886) § 4, exempting from taxation the personal property of insurance companies, does not affect assessments already made for the year 1886, though section 6 provides that the act shall take effect immediately. 35 N. Y. Supp. 857, affirmed.

2. SAME—BANK STOCK.
    Laws 1886, c. 679, § 4, providing that the personal property of all insurance companies "incorporated under the laws of this state, or any other state or country, and doing business in the state, shall hereafter be

exempt from taxation, except as in this act prescribed," exempts a foreign insurance company from taxation on shares of stock owned by it in a New York bank.

3. SAME—PAYMENT UNDER MISTAKE AS TO LAW—NONRESIDENTS.
Where a nonresident pays taxes unlawfully assessed on property owned by it in New York, in ignorance of the New York law, his mistake is one of fact, as nonresidents are not presumed to know the law, as in the case of residents.

4. SAME—PAYMENT UNDER COERCION.
Payment of taxes after a warrant has been delivered to the collector is not a voluntary payment.

5. SAME—BANK STOCK—AGENCY OF BANK TO PAY TAXES.
Where a bank is required by law to retain from the earnings of its shares of stock a sufficient sum to pay taxes thereon assessed against the stockholders, the bank is thereby constituted the agent of the stockholders to pay any legal tax assessed against the stock; but payment of an illegal tax is not within the agency, and therefore a stockholder may recover it as money paid out to his use.

6. SAME—PAYMENT FROM EARNINGS OF STOCK.
In an action to recover money paid to defendant for taxes levied on bank stock owned by plaintiff, it appeared that the payment was made by the bank. The cashier testified that the bank always paid personal taxes on the shares of such of the stockholders as were liable to taxation, giving one check for the total amount, and to those stockholders who were not subject to taxation a proportionate amount was remitted, called a "tax dividend," so that the amount paid each year was equalized to the stockholders. *Held*, that such payment by the bank was from moneys belonging to the stockholders. Ingraham, J., dissenting.

7. SAME—VOLUNTARY PAYMENT BY THIRD PERSON.
In an action to recover money belonging to plaintiff paid to defendant by a third person without authority, plaintiff need not allege that the payment by such third person was involuntary, but only that plaintiff did not consent thereto.

Appeal from circuit court, New York county.

Action by the Aetna Insurance Company against the mayor, aldermen, and commonalty of the city of New York, to recover for money paid for taxes on bank stock. A judgment for $23,881.01, in favor of plaintiff, was entered on a verdict rendered by direction of the court. 35 N. Y. Supp. 857. Defendant appeals from the entire judgment, and plaintiff appeals from such part of the judgment as adjudges that it recover the sum of $23,881.01 only. Affirmed.

This is an action to recover money paid for taxes for the years 1886, 1887, and 1888, imposed on bank stocks owned by the plaintiff, a Connecticut insurance corporation, which during those years carried on the business of fire and marine insurance in the state of New York. The complaint, in brief, alleges that the taxes were illegal and void, and that the city collected such taxes from the respective banks whose stock was owned by the plaintiff; that such collections were without the plaintiff's knowledge or consent, and were wrongfully deducted from funds in the possession of the banks belonging to plaintiff, against its will; and that the defendant now holds such money to the use of the plaintiff. In addition to the denials, the answer alleges that the plaintiff neglected to take any steps to review, correct, or vacate any of the assessments, or to stay or prevent the collection of any of the taxes based thereon; that the taxes were paid voluntarily, without force or duress; and that, if paid under any mistake, it was a mistake of law, and not of fact. The defense is a denial of illegality, and a plea of voluntary payment upon

a claim of right, without mistake of facts. It was proved on the trial that the taxes were paid by the respective banks with their own checks, the taxes of all stockholders in each year, including the plaintiff's, being paid in gross by a single check. To those stockholders who had sworn off their taxes, so that their names did not appear in the assessment rolls in the hands of the receiver of taxes, the banks were accustomed to pay, in addition to the regular semiannual dividends, a further sum equal to the amount of taxes that would have been imposed if the assessments had not been canceled. The stockholders whose names did appear in the receiver's books were always paid the regular semiannual dividends, without deduction for taxes, or, as the banks expressed it, "free of tax"; but such stockholders never received the tax rebate paid to the stockholders who had secured the cancellation of their assessment. The manner of collecting these taxes, as shown, was for the tax officers to send to each bank a tax bill showing the gross amount of taxes standing on the books of the receiver against the stockholders, and the cashier of the bank would send a check for the full amount, less the rebate referred to. Sometimes the banks asked for the bill, and sometimes it was sent without request. This practice had been continued for some years prior to 1886, and was followed in connection with the payment of the taxes in dispute. The president of the plaintiff, who was its assistant secretary at the time of the levy and payment of these taxes, and the confidential assistant of the then president of the company, who had such matters in charge, testified that he had no knowledge of the imposition or payment of the taxes at the time, and that no officer of the corporation had knowledge of them, so far as he knew, though it is admitted that notices were received from certain of the banks, notifying them that the commissioners of taxes would impose an assessment on the stockholders of banks, and advising them of their right to reduce assessments by the deduction of debts, to be attended to in person at the tax commissioners' office; and, in addition, other banks sent communications to plaintiff, accompanying payment of dividends, specifying that such dividends were "free of tax." In April of each of the years 1887 and 1888, the plaintiff addressed a communication to the tax commissioners, claiming exemption from taxation upon its shares of bank stock, under chapter 679 of the Laws of 1886. At the close of the testimony, each party moved for the direction of a verdict, and the court sustained the contention of the defendant as to the tax for the year 1886, and the contention of the plaintiff for the full amount of the taxes in each of the years 1887 and 1888, with interest; and from the judgment entered upon such direction both parties appeal.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Thomas P. Wickes, for plaintiff.
George S. Coleman, for defendant.

O'BRIEN, J. Were it not for the zeal and ability with which we are urged to review this record, we might well rest our conclusion on the able opinion delivered by Judge Lawrence in the court below, who, after marshaling the facts and reviewing the law, we think, correctly disposed of all the questions raised upon this appeal.

The exemption claimed by plaintiff was pursuant to chapter 679 of the Laws of 1886, which went into effect on June 15th of that year, and which, after determining what tax should be paid, provided, by section 4, as follows:

"The lands and real estate of such insurance companies shall continue to be assessed and taxed where situated for state, city, town, county, village, school, or other local purposes; but the personal property, franchise and business of all insurance companies incorporated under the laws of this state, or any other state or country, and doing business in this state, and the shares

of stock of said companies, shall hereafter be exempt from all assessment or taxation except as in this act prescribed; provided that this section shall not affect the fire department tax of two per cent. now required to be paid."

At the time this act was passed, it was thought by the city that it did not relieve insurance companies of taxation on personal property for local purposes, but the court has held otherwise. Mutual Ins. Co. v. City of Poughkeepsie, 51 Hun, 595, 4 N. Y. Supp. 93; People v. Coleman, 121 N. Y. 542, 25 N. E. 21. Those cases are direct authorities for the proposition that fire and marine insurance companies are not liable to a tax upon their personal property for local purposes. The force of these decisions is sought to be broken by the distinction which the defendant would make between domestic and foreign companies. But as the language of the statute is directly applicable to "all insurance companies incorporated under the laws of this state or any other state or country, doing business in this state," we think the distinction cannot be sustained.

It is further urged that bank shares owned by the plaintiff were not within the statute; that the state had an entirely separate and independent system of taxation for stockholders of state and national banks, not abrogated.

An argument in support of this view is furnished by a dictum of Earl, J., in People v. Coleman, 135 N. Y. 238, 31 N. E. 1022:

"It may, at least plausibly, if not well, be claimed that a corporation owning bank shares may be taxed upon them, although generally exempt from taxation as to its other personal property. Bank of Redemption v. Boston, 125 U. S. 80, 8 Sup. Ct. 772."

In neither of these cases was the court required to decide the question we are now considering; and, if the language which we have quoted could be held applicable to a statute such as the one under discussion, then, undoubtedly, the expression, if only a dictum, of so able and experienced a jurist as Judge Earl, would be entitled to great consideration and respect. In one case, however (Bank of Redemption v. Boston), the question involved was as to the liability to taxation of one national bank as a stockholder in another national bank. And in People v. Coleman, from which we have quoted, the question involved was whether the provisions of the Revised Statutes exempting "the personal estate of every incorporated company not made liable to taxation on its capital" exempted a foreign savings bank from taxation upon its surplus invested in this state, some portion of which was represented by bank shares here; and such savings bank was held liable. It was therein said: "As a general rule, all property within this state is liable to taxation; and, to sustain a claim of exemption, the claimant must point out some statute clearly giving it." This is what we think the act of 1886 does, because, after providing for a scheme of taxation, it provides that the personal property, franchises, and business of such companies "shall hereafter be exempted from all assessment or taxation, except as in this act prescribed." Unless, therefore, we are prepared to hold that bank stock is not personal property, it is brought within the express exemption given by the act. Our conclusion, therefore, is that

this statute exempts the plaintiff from the payment of a tax upon its bank shares.

This brings us naturally to the next consideration, as to whether the exemption applied to the tax for the year 1886. In addition to the cases cited by the learned trial judge, we must regard the question as settled in this court by our decision in Re American Fine Arts Soc. (announced June 5, 1896) 39 N. Y. Supp. 564. There it appeared that, by an act of the legislature which took effect on May 3, 1895, property belonging to the society became exempt from taxation. The question was presented whether it applied to the tax for that year, 1895; and it was therein held that upon the 1st day of May the character of the property as to its being subject to a tax for that year became fixed, "and that, the property thus becoming taxable for that year, an act subsequently passed relieving such property from taxation, and having no retroactive effect, could not affect the taxable condition of the property for such year."

The bank shares held by plaintiff having been illegally taxed for the years 1887 and 1888, and the tax paid by the banks, the question remains whether the plaintiff can recover back the amounts so paid. The city claims that, though the tax was void, the plaintiff cannot recover the moneys received by it, because such payments were voluntary, without duress of fact or law. What constitutes a voluntary payment was considered in United States Trust Co. v. Mayor, etc., of New York, 77 Hun, 190, 28 N. Y. Supp. 344; and need not be restated. The plaintiff and its officers, being nonresidents of the state, are not held to that knowledge of the law to which residents of the state are held; and their mistake, if present, is not one of law, but of fact. But, apart from this, the payment was necessary to relieve the stock from the burden imposed upon it by the law from the moment the warrants were delivered to the collector. 2 Rev. St. (8th Ed.) p. 1580, § 314. And there are other considerations which incline us to the view that the payments were not voluntary, within the meaning of decisions denying recovery on that ground.

The payments were not made by the plaintiff, but by the banks, in the usual course of their business; and, while the latter may be regarded as the agents of the plaintiff for the purpose of paying any legal tax, we do not think the evidence would justify our concluding that their power or authority would extend to the payment of an illegal tax. The only agency was that imposed under the provisions of the statute which required them to hold the money so that it might be collected out of the dividends of shares of the stockholders. Such agency is one imposed by law, and cannot extend beyond the payment or withholding of dividends where lawful taxes have been imposed; and we agree with the plaintiff that the legislature could not empower one person to pay for another what that other person cannot lawfully be required to pay himself. Consequently, when it appears that the tax in question is illegal, the agency of the bank to withhold it, or to pay it over to the receiver of taxes, or to permit him to collect it out of the plaintiff's dividends or shares, ceases to exist. Board v. Ellis, 59 N. Y. 620.

Nor do we think that the knowledge which the plaintiff received through notices from the banks of the fact that a tax was levied required it to do more than it did in addressing a communication to the tax commissioners claiming exemption by reason of chapter 679 of the Laws of 1886, which they had a right to assume the tax commissioners would pay attention to; and the payment by the banks, without the express assent or knowledge of the plaintiff until the payment was made, cannot be regarded as a voluntary payment by the plaintiff. Even, therefore, though payment by the banks was voluntary on their part, it having been made in violation of the rights of the plaintiff, it cannot be regarded as a voluntary payment by the latter, because, as we view the doctrine of voluntary payment, it is applicable only where payment is made by the plaintiff directly or by his personally authorized agent, and should not be extended to a case where the defendant has received from third persons moneys belonging to the plaintiff. Carver v. Creque, 48 N. Y. 385; Hathaway v. Town of Cincinnatus, 62 N. Y. 434; Horn v. Town of New Lots, 83 N. Y. 100; Mason v. Prendergast, 120 N. Y. 536, 24 N. E. 806. These cases are authority for the view that it is not necessary to allege and prove that the payment was involuntary by such third person, but only that the plaintiff did not will or consent thereto. It was conceded upon the record that the payments were made by the representatives of the different banks, without consulting the stockholders, and therefore without special authorization.

It is insisted, however, that the money paid to the city was not the money of the plaintiff, but the bank's money. It is true, it was paid by a check drawn on a fund in the bank, but that such fund had been appropriated out of earnings to pay dividends, and thus, under the decisions, became the property of the stockholders, we think the evidence conclusively shows. Thus, the cashier of the Nassau Bank testifies:

"The bank always ascertained those who were not liable for taxes, * * * and then the bank paid the personal tax to the city * * * in one check. We did that without consulting our stockholders. * * * We have always paid a tax dividend to those of our stockholders who were not liable according to the books of the city. We went to the city, and asked for a list of those who were not liable according to their books. The city gave us that list, and the taxes that we paid in a lump sum was for the stockholders who were not on that list. The others * * * we sent a check for that amount, at the same rate that the city was charging us. On our books we call it a 'tax dividend.' We paid two dividends, which we call 'regular dividends,' in 1886, 1887, and 1888; and then we paid an additional amount, either in the way of tax to the city or by way of a tax dividend, to such of the stockholders as appeared by the city's books to be exempt from taxation,—so that the amount we paid in each year was equalized to our stockholders in that way. We either paid the tax on their account, or else gave them a tax dividend. Our dividends were advertised, and always read: 'Semiannual dividend of such a per cent. payable out of the earnings of the last six months free trom tax.' Our second dividend falls due in November, at about the time the taxes are payable to the city, and at that time we pay a tax dividend to those who are entitled to it. * * * The taxes have always been about two per cent., and at the May dividend we laid aside what we considered about half our taxes; and at the November dividend * * * the other half came out of that dividend."

It is expressly conceded upon the record that the representatives of the various banks would testify to the same effect as did the representative of the Nassau Bank with respect to the method of declaring their regular dividends, of paying the same to stockholders, and of paying to other stockholders whose names did not appear on the assessment rolls as finally received by the receiver of taxes a rebate or refund equivalent to the amount that would have been assessed against them as a tax if this had been assessed. Can it be seriously urged that money thus taken from dividends declared, and from a fund appropriated to dividends, and to which the stockholders were legally entitled, was not their money? The tax was not on the bank, but on the stock, and was a lien thereon, and was assessable against the holders thereof. If the banks, after the tax was imposed, permitted the transfer of stock before the tax was paid, the banks would be liable for the tax; hence the duty resting on the banks of seeing that the tax was paid. In paying it, therefore, it paid out of dividends or a fund created out of a portion of the bank's earnings appropriated to stockholders; and it was paid by the banks, not to discharge their own debt, but the debt of the stockholders, and out of moneys which legally belonged to the latter. The insistence, therefore, that the moneys so paid were the bank's moneys, we regard as without merit, because it appears beyond dispute that, in addition to the first dividend, at about the time when the taxes were payable, a second dividend was declared upon the stock of the bank, which at once became the property of the owners of the stock, and from this was deducted the amount which the bank had to pay to the collector for such stockholders whose stock was assessable, and to the others who were not obliged to pay the tax the full amount of the dividend was remitted. What the bank, therefore, in fact paid, was the plaintiff's money.

It is further ingeniously suggested that, in this view, the bank was either the agent for the plaintiff (in which case the payment was voluntary), or it was not such agent (in which latter event the plaintiff has a legal claim against the bank for the amount of such payments). This contention was presented in some of the cases already cited, and was answered by the learned judge:

"The taxes for the years 1887 and 1888 having been illegally imposed on the plaintiff's shares, it cannot, in my opinion, be successfully argued that the action of the banks in paying the same to the receiver of taxes estops the plaintiff from maintaining this action. The banks were not the agents of the plaintiff for any such purpose. The amount paid over was a specific fund belonging to the plaintiff, which the banks delivered to the defendant's officer, without the plaintiff's consent. In such case an action for money had and received can be maintained for the recovery of the money from the party receiving it. Mason v. Prendergast, 120 N. Y. 536, 24 N. E. 806; Horn v. Town of New Lots, 83 N. Y. 100."

There are many other suggestions urged in support of the city's right to hold this money. which we do not think it necessary to discuss. After all, the salient facts are that these moneys belonging to the plaintiff were illegally obtained by the defendant; and, even in favor of the city, the court should never be astute to find a way

to enable it to retain ill-gotten gains.     While, in every proper and legal way, the city should be upheld in its right and power to collect the taxes so necessary for the expenses of administration and government, it should be equally held to the rule of fair dealing, which demands that moneys illegally exacted should be returned.

As it will be seen that we have reached the same conclusion as the learned trial judge, the judgment in all respects should be affirmed, with costs.

VAN BRUNT, P. J., and WILLIAMS and PATTERSON, JJ., concur.

INGRAHAM, J. (dissenting).   Upon the appeal by the plaintiff, I concur with Mr. Justice O'BRIEN; and, for the reasons stated by him, the judgment upon that appeal should be affirmed, with costs. Upon the appeal by the defendant, however, I am unable to concur in the conclusion arrived at by Mr. Justice O'BRIEN.

The plaintiff is a foreign insurance company, and on the second Monday of January, 1896, was the owner and holder of certain shares of stock in various banks doing business in the city of New York.   The complaint alleges three causes of action to recover for the taxes paid the city of New York upon such shares of bank stock for the three years, namely, 1886, 1887, and 1888, and, except in the change of dates, the allegations constituting each of the three causes of action are the same.   Each of such causes of action is based upon the facts, alleged in the complaint:   That the defendant claimed and pretended that it imposes a tax upon the shares of bank stock owned by the plaintiff; that the amount of such tax severally was and constituted a valid lien upon the respective shares of stock owned by this plaintiff, and a personal liability against this plaintiff, which the defendant could enforce against the plaintiff, and that, by the laws of the state of New York, the duty was imposed upon each of the banks and its officers to retain so much of any dividend or dividends belonging to this plaintiff as should be necessary to pay the amount of the tax upon the plaintiff's shares of bank stock in said bank; that, upon such claim and pretense, the defendant illegally and wrongfully exacted and collected from each of said banks, as such alleged tax, without the knowlege, direction, or consent of the plaintiff, and under compulsion, certain amounts alleged in the complaint, "which moneys were wrongfully deducted out of the money in the possession of said bank belonging to this plaintiff, against its will, and without its consent or knowledge, and have been received and retained by the defendant without right, and said defendant has refused, and still refuses, to pay," etc.; and that the assessment, levy, and collection of the tax were void and illegal, as the plaintiff was at that time exempt from taxation.   These allegations are denied by the answer.

I find no evidence in the record to support the allegation that the moneys which were paid by the bank "were wrongfully deducted out of the moneys in the possession of said bank belonging to this plaintiff."   The plaintiff offered in evidence a statement showing

the dividends paid by the several banks in which it owned stocks during the years 1886, 1887, 1888, 1889, and 1890, by which it appeared that the dividends received in the years 1889 and 1890 were considerably in excess of the dividends received in the preceding years. The president of the plaintiff corporation swore that the banks never had any right to pay this tax, but that, in the opinion of the witness, if the banks had not paid this tax, they would have declared another dividend for the amount of this tax, which the plaintiff would have received. All that he knows about it is that in latter years they did receive a dividend which they did not receive in 1886, 1887, and 1888. There is no allegation that any such dividend in that year was declared for the tax, or that the bank was under any obligation to pay any dividend for that year, except the dividend that it did pay, and which plaintiff received. There is no evidence that any such dividend was declared prior to the year 1886, the evidence showing that it was received subsequent to the year 1889. An officer of one of the banks in which the plaintiff had stock testified that it had been the custom of that bank to pay the tax to the city of New York upon the shares of stock which the city assessed; and, to those whose stock was not taxed by the city, they were in the habit of sending checks for the amount the tax would have been, had the shares been liable, calling such payment the "tax dividend." No such tax dividend, however, was ever declared upon the stock held by the plaintiff. What the plaintiff received was the regular dividend declared by the bank, which was declared and paid free of tax; and the plaintiff never made a demand upon the bank for what the witness called the "tax dividend." The witness further testified that the regular dividend was paid free from tax; that the tax was paid to the city out of the funds of the Nassau Bank by a check, and that that check was charged to profit and loss; that there was nothing to distinguish the funds from which that check was paid from any other fund out of which the bank paid money; and that there was no formal action of the board of directors in regard to this tax dividend, the president simply sending to those stockholders who were not taxed an amount that he considered equivalent to the tax.

It seems to me very clear that there is no evidence here to show that the tax which was paid by the bank upon plaintiff's shares of stock was the plaintiff's money, or that plaintiff is entitled to recover it from the city. It is clear that it was the money of the bank, paid by the bank to relieve it from liability under the tax law of the state, which prevents a bank from paying any dividend to its stockholders upon whom a tax is assessed until such tax has been paid; and when the bank declared this dividend to the plaintiff on its stock, free from the tax, and then, to avoid a liability to the city on account of the payment of such dividend, paid its own money to relieve the plaintiff from the tax assessed against it, it was the bank's money, not the plaintiff's money, that was paid; and the plaintiff certainly is not entitled to recover it from the city. The fact that it is probable that the bank would have voluntarily paid to the plaintiff an amount equal to the tax if it had not paid

the tax cannot vest the title for the money it had paid to the city in the plaintiff. Assuming that the payment of this tax was not a voluntary payment by the bank, and the tax was void, it would be entitled to recover the amount paid from the city; and to allow the plaintiff to recover would thus subject the city to a double liability for the repayment of the money paid by the bank to the city. The payment was not made for the use of the plaintiff, but was made to the city to pay a tax imposed by the city upon stock of the bank making the payment, and which that bank was required by law to pay to the city before it paid any dividend to its stockholders. There is absolutely nothing to show that this money ever was the money of the plaintiff, ever was paid for the use of the plaintiff, or that the plaintiff ever had any title to it.

It is well settled that a stockholder has a demand against a corporation to recover its profits until the corporation, by a formal declaration of a dividend, appropriates a portion of its assets to its stockholders. Thus, Peckham, J., in Hopper v. Sage, 112 N. Y. 533, 20 N. E. 350, says:

"It has been held a number of times in this court that, when a dividend is declared, it belongs to the owner of the stock at that time, but that, until such declaration, the profits form part of the assets; and an assignment by a stockholder before such declaration carries with it his proportional share of the assets, including all undeclared dividends."

It being clear that the money was the money of the bank, paid by the bank to the city for its own use, there is no privity between the plaintiff and the city which would entitle the plaintiff to recover from the city for money had and received. Thus, in Peckham v. Van Wagenen, 83 N. Y. 44, it was held that a person who was wrongfully excluded from the rights of a stockholder could not recover, from the person recognized by the corporation as a stockholder, dividends paid to such person upon the stock, the court saying:

"Her remedy, if she was wrongfully excluded from the rights of a stockholder, was against the company; and she was not entitled to follow the assets of the company into hands of parties to whom it had made payments, and to recover her dividends from them, until, at least, she had established her right as a creditor of the company, and exhausted her legal remedies against it. She could not, in the first instance, resort to a common-law action against the persons whom the company had recognized as its only stockholders, to recover a portion of the dividends admitted to be due and actually paid to them in their own right, and try her title to the shares in actions against them, as an action for money had and received falls directly within the principle of Butterworth v. Gould, 41 N. Y. 450, even if the plaintiff had established a clear legal title to the shares, and a right of action against the company for the dividends thereon. The defendant received the dividends, claiming them as his own, and under no pretense of authority from the plaintiff; and the payment was made to him in recognition of his title thereto as his own, and did not purport to discharge the company from its liability, if any, to the plaintiff; and the case cited, as well as the prior case of Patrick v. Metcalf, 37 N. Y. 332, holds in express terms that, under such circumstances, there is no trust and no implied promise to pay the money to the plaintiff."

It seems to me that the principle established in this case is conclusive in the decision of the case at bar. The money here was the money of the bank. It was paid to and received by the defendant

v.40 N.Y.S.no.1—9

for its own use, as money legally due to it, and there existed no relation of trust between the plaintiff and the defendant, and no implied promise to pay the money to the plaintiff. Assume, as plaintiff claims, that this tax imposed was absolutely void, and that the action of the banks was equivalent to declaring an extra tax dividend to those of its stockholders who were not legally taxed by the city of New York; plaintiff might have a right of action against the bank to recover that declared dividend unpaid, but could have no action against the city of New York to recover money paid by the bank as its own money, and for the use and purposes of the city. The plaintiff cannot claim that the bank acted as its agent in making this payment to the city, and thus it was the plaintiff's money which was paid, without at the same time accepting the act in making the payment as the act of the plaintiff, in which case it is clear that it was a voluntary payment, and cannot be recovered back. If it was the plaintiff's money which was paid by the plaintiff through its agent, the bank, it was then a voluntary payment by plaintiff through its agent to the city. If it was not the plaintiff's money paid by its agent to the city, then it cannot recover in an action for money had and received.

I think, therefore, that the judgment should be reversed, and the complaint dismissed, with costs.